IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| THU MONG TANAKA, DANIEL PETER LIASHENKO, | ) ) ) | CIVIL NO. 09-00579 SOM/KSC |
| Plaintiffs, | ) ) | ORDER GRANTING IN PART, DENYING IN PART DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT |
| vs. | ) ) | |
| DEPARTMENT OF ACCOUNTING AND GENERAL SERVICES, STATE OF HAWAII, | ) ) ) ) | |
| Defendant. | ) ) ) | |

_____

ORDER GRANTING IN PART, DENYING IN PART
DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT

I.      INTRODUCTION.

        Two former employees of the State of Hawaii's

Department of Accounting and General Services assert employment

discrimination and retaliation claims under Title VII.

        Plaintiff Thu Mong Tanaka is a woman of Vietnamese

descent who alleges that national origin and race discrimination

caused her to be denied the option of choosing the shift she

wanted in her Computer Operator III position.  Plaintiff Daniel

Peter Liashenko is a Caucasian man who alleges that race and

gender discrimination caused him not to be promoted from his

Computer Operator II position to a Computer Operator III

position.  Tanaka and Liashenko also both allege that Defendant

Department of Accounting and General Services retaliated against

them for filing complaints with the Hawaii Civil Rights

Commission and the Equal Employment Opportunity Commission.

On December 15, 2010, the Department of Accounting and General Services filed motions for summary judgment against Tanaka and Liaskenko, respectively.  This court grants in part and denies in part the motions for summary judgment.

II.     FACTUAL BACKGROUND.

Thu Mong Tanaka is a woman of Vietnamese descent who worked for the State of Hawaii for over thirty years.  See Declaration of Thu Mong Tanaka ¶¶ 3, 9 ("Tanaka Decl.), ECF No. 47-1.  Since 1997, Tanaka had been a Computer Operator for DAGS.  See id. ¶ 17.  Daniel Peter Liashenko is a Caucasian man who has been employed by the State of Hawaii since 2005.  See Declaration of Daniel Peter Liashenko ¶ 17 ("Liashenko Decl.), ECF No. 46-1.  Liashenko has been a Computer Operator II ("CO II") at the Department of Accounting and General Services ("DAGS") and later an Office Assistant at the Department of Commerce and Consumer Affairs.  See id. ¶¶ 17, 58; Def. Mot. Summ. J. at 2, ECF No. 37.

In January 2006, DAGS advertised to fill a Computer Operator III ("CO III") position.  The opening was offered only to existing Hawaii state employees.  See ECF No. 47, Ex. I.  Tanaka and Liashenko did not apply for this position.  In September 2006, DAGS advertised two openings for Computer Operator III positions to Hawaii state personnel and external applicants.  See ECF No. 47, Ex. J.  The job description for the positions was the same as for the January 2006 opening except

2

that the September 2006 opening added "Supervisor Experience/Aptitude" as part of the qualification requirements. See id. The Department of Human Resources Development ("DHRD") issued the recruitment notice and allegedly established the minimum requirements for the CO III positions. See id.; Reply at 12, ECF No. 51.

Ten individuals applied for the CO III positions advertised in September 2006, and DHRD determined that three applicants met the minimum qualifications. See Declaration of Diane Matsuura ¶ 6 ("Matsuura Decl."), ECF No. 37-4. On September 29, 2006, Tanaka, Liashenko, and Sandra Furumori interviewed for the positions. See id. ¶ 8. At the time, Tanaka and Liashenko were already DAGS employees. Furumori had previously worked for the State of Hawaii from 1976 to 1984, see Declaration of Sandra Furumori ¶ 3 ("Furumori Decl."), ECF No. 39-5, but in 2006 was employed at Saint Francis Medical Center, a private institution, as a Systems Administrator. See id. ¶ 2; Matsuura Decl. ¶ 7. The interview panel for the CO III positions consisted of four DAGS employees from the Production Services Branch: Chairperson and Supervisor Clifford Lucas, Computer Scheduler April Andrade, Supervisor Irene Ajitomi, and Supervisor Steve Nieto. See Matsuura Decl. ¶ 8.

During Liashenko's interview, Ajitomi, who was Liashenko's supervisor at the time, allegedly asked Liashenko a

3

friendly leading question.  <u>See</u> Matsuura Decl. ¶ 9.  Ajitomi

first asked Question #7: "Have you volunteered to help your

leader operator or supervisor on your shift going beyond the

position description of a computer operator?  Give details."

<u>See</u> <u>id.</u>  After Liashenko responded, Ajitomi allegedly asked,

"Didn't you update or keep documentation manuals and didn't you

work on documentation updates?"  <u>See</u> <u>id.</u>  Ajitomi did not ask

this follow-up question to Furumori or Tanaka.  <u>See</u> <u>id.</u>

After the candidate interviews were completed, DAGS

supervisors Glen Togashi and Elton Sumida expressed concern about

the incident.  Togashi was the Data Processing System Manager and

Production Services Branch Chief of the Information and

Communication Services Division ("ICSD").  <u>See</u> Matsuura Decl.

¶¶ 4, 19.  Sumida was the Computer Operations Supervisor II of

the Production Services Branch within ICSD.  <u>See</u> Declaration of

Elton Sumida ¶ 2 ("Sumida Decl."), ECF No. 51-3.  Togashi and

Sumida disqualified Ajitomi's interview scores for all three

interviewees on the ground that Ajitomi had been biased toward

Liashenko.  <u>See</u> Matsuura Decl. ¶ 11.  Ajitomi had given Liashenko

a perfect interview score of "100."  <u>See</u> <u>id.</u> ¶ 10.  Togashi and

Sumida said they were concerned about the rating because

Liashenko had worked as a Computer Operator II for less than a

year.  <u>See</u> Sumida Decl. ¶ 10.  The panel also chose to eliminate

Question #7 and readjusted the other interviewers' scores to

4

reflect that change.  See id. ¶ 11.

     The remaining three panel members unanimously rated
Furumori as the top candidate and Tanaka as the second.  See
Matsuura Decl. ¶ 14.  Disqualifying Ajitomi's scores did not
affect the final ranking of the candidates.  See id. ¶ 13.
Furumori and Tanaka were accordingly chosen to fill the two CO
III positions.  Because Furumori was the top scoring candidate,
she was given the first choice of work shifts; she chose the day
shift over the night shift.  See Tanaka Decl. ¶¶ 36, 40.

     On October 23, 2006, Tanaka was informed that she had
been selected for a CO III position and assigned the night shift.
See Tanaka Decl. ¶ 36.  On October 31, 2006, Liashenko received a
letter from Togashi stating that he had not been selected for a
position.  See Liashenko Decl. ¶ 23.  When Liashenko asked why he
was not being offered a promotion, Togashi responded that
Liashenko's average overall score was 202 out of a possible 300.
See ECF No. 46, Ex. H.

     Furumori started on the day shift in her new position
on November 27, 2006; Tanaka started her night shift on November
28, 2006.  See Tanaka Decl. ¶ 40.

     On December 1, 2006, Lianshenko filed a complaint with
the Hawaii Civil Rights Commission ("HCRC") and the Equal
Employment Opportunity Commission ("EEOC") alleging race and
gender discrimination based on the decision not to select him for

either of the Computer Operator III positions.  See ECF No. 46, Exs. J & K.  On January 10, 2007, Tanaka filed her complaint alleging national origin discrimination with the HCRC and EEOC. See ECF No. 47, Exs. O & P.  Tanaka based her charge of discrimination on the interview panel's decision to make Furumori the first selectee and on her assignment to a work shift she had not preferred.  See id.

In March 2008, the EEOC determined that there was cause to believe that DAGS had discriminated against Tanaka on the basis of her national origin and against Liashenko on the basis of his race and gender.  See ECF No. 37, Ex. F; ECF No. 39, Ex. E.  The EEOC stated that Elton Sumida may have "poisoned" the interview process.  See ECF No. 39, Ex. G.

Before the September 2006 interviews, Sumida had allegedly informed Ajitomi that he believed Furumori should be hired as the CO III.  See id.  Sumida had also given Furumori a tour of the ICSD facilities in June 2006.  See Tanaka Decl. ¶ 35; ECF No. 47, Ex. U.  On May 28, 2008, and June 20, 2008, DAGS submitted a written request to the EEOC for reconsideration. See ECF No. 46, Ex. S; ECF No. 47, Ex. T.  The EEOC denied the request about a year later.  See ECF No. 46, Ex. DD; ECF No. 48, Ex. FF.

After DAGS announced the results of the interview panel selections, the Hawaii Government Employees Association ("HGEA")

6

submitted a grievance on behalf of Liashenko and challenged the selection process.  See ECF No. 37, Ex. D.  In 2008, the grievance went to a five-day arbitration.  See Arbitration Decision & Award ("Arbitration"), ECF No. 37, Ex. C.  Sumida, Togashi, and the four interview panel members all testified. See id.  On June 27, 2008, Arbitrator Gail Kang upheld Liashenko's nonselection because the interview process was "not unreasonable, arbitrary, or capricious."  See Arbitration at 7. The Arbitrator also found that the interview questions were appropriate and the selection process not overly subjective.  See id. at 7-10.  She found that the evidence showed that Furumori was the most qualified candidate.  See id. at 11.

Tanaka and Liashenko allege that DAGS retaliated against them for having filed discrimination complaints with the EEOC and HCRC.  Liashenko notes that he was investigated for having allegedly left work early because he was ill, see ECF No. 37, Ex. M, and for allegedly having failed to perform his work properly.  See Liashenko Decl. ¶¶ 47, 52.  Liashenko states that DAGS was also retaliating against him in adopting a new policy requiring all employees to stay in the computer room until the end of their shifts.  See Liashenko Decl. ¶ 53; ECF No. 46, Ex. JJ.

Tanaka and Liashenko allege that DAGS was retaliating against them in issuing a memo stating that the break room was

7

off limits after shift turnovers.  See Liashenko Decl. ¶ 55.  A "turnover" involves the passing on of information from one shift to another.  It may relate to a problem occurring on a shift or to unfinished tasks that continue to need attention on the next shift.  See Opp'n at 4-5, ECF No. 45.  On November 12, 2008, Furumori had issued a memorandum stating that Computer Operations Staff could use the break room after turnovers.  See ECF No. 37, Ex. O.  On December 8, 2008, Furumori allegedly entered the break room when Tanaka and Liashenko were the only other persons present.  See Liashenko Decl. ¶ 56.  On December 12, 2008, Furumori issued a new memo stating that the break room was off limits after turnovers.  See id.; ECF No. 48, Ex. PP.  As a result of these allegedly retaliatory events, Tanaka and Liashenko amended their complaints to the HCRC and EEOC to include retaliation claims.  See ECF No. 46, Ex. HH; Tanaka Decl. ¶ 89.

In August 2009, Tanaka and Liashenko received reduction-in-force ("RIF") notices in which they were informed that their positions at DAGS were being abolished.  See ECF No. 46, Ex. OO; ECF No. 48, Ex. UU.  DAGS says that the RIF was carried out pursuant to the DHRD Policy and the applicable collective bargaining agreement for Bargaining Unit 03.  See Second Matsuura Decl. ¶¶ 17-19, ECF No. 51-1.  Tanaka and Liashenko claim that they had to complete the RIF/layoff

8

application to seek other positions with DAGS. See Liashenko Decl. ¶ 58; Tanaka Decl. ¶ 103. Tanaka filled another CO III position, which she believes involving an exercise of her seniority right to "bump" her fellow employee, Benjamin Quimino, from his CO III position. See Tanaka Decl. ¶¶ 103, 104. In December 2009, Tanaka retired from DAGS after three years as a CO III. See Tanaka Decl. ¶ 118. Liashenko was assigned a new position as Office Assistant IV, which he claims is a demotion. See Liashenko Decl. ¶ 58. In late 2009, Tanaka and Liashenko received right-to-sue letters from the EEOC and the HCRC.[1]

In their Complaint, Tanaka and Liashenko assert two claims for relief. In the first claim, Liashenko asserts race and gender discrimination, and Tanaka asserts national origin discrimination, all in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-1, and Hawaii Revised Statutes § 378-2(1). See Compl. ¶¶ 1, 32. In the second claim, Plaintiffs argue that DAGS retaliated against them for having filed discrimination charges with the EEOC and the HCRC. See id. ¶¶ 1, 33. On December 15, 2010, DAGS submitted separate summary judgment motions for each Plaintiff. On February 22, 2011, this court held a hearing on the motions for summary judgment, and

_____

[1] This fact appears to be to be undisputed. Plaintiffs refer to this action in paragraphs 26 through 31 of their Complaint. Defendants refer to it in their Concise Statement of Facts. See ECF No. 38.

continued the hearing on April 11, 2011, after receiving
supplemental briefing.

III.      <u>STANDARD OF REVIEW.</u>

      Summary judgment shall be granted when "the pleadings,
the discovery and disclosure materials on file, and any
affidavits show that there is no genuine issue as to any material
fact and that the movant is entitled to judgment as a matter of
law." Fed. R. Civ. P. 56(c). One of the principal purposes of
summary judgment is to identify and dispose of factually
unsupported claims and defenses. <u>Celotex Corp. v. Catrett</u>, 477
U.S. 317, 323-24 (1986). Accordingly, "[o]nly admissible
evidence may be considered in deciding a motion for summary
judgment." <u>Miller v. Glenn Miller Prods., Inc.</u>, 454 F.3d 975,
988 (9th Cir. 2006).

      Summary judgment must be granted against a party that
fails to demonstrate facts that establish what will be an
essential element at trial. <u>See</u> <u>Celotex</u>, 477 U.S. at 323. A
moving party has both the initial burden of production and the
ultimate burden of persuasion on a motion for summary judgment.
<u>Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos. Inc.</u>, 210 F.3d
1099, 1102 (9th Cir. 2000). The burden initially falls on the
moving party to identify for the court "the portions of the
materials on file that it believes demonstrate the absence of any
genuine issue of material fact." <u>T.W. Elec. Serv., Inc. v. Pac.</u>

Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987)

(citing Celotex Corp., 477 U.S. at 323); accord Miller, 454 F.3d

at 987. "A fact is material if it could affect the outcome of

the suit under the governing substantive law." Miller, 454 F.3d

at 987.

When the moving party fails to carry its initial burden

of production, "the nonmoving party has no obligation to produce

anything." In such a case, the nonmoving party may defeat the

motion for summary judgment without producing anything. Nissan

Fire, 210 F.3d at 1102-03. On the other hand, when the moving

party meets its initial burden on a summary judgment motion, the

"burden then shifts to the nonmoving party to establish, beyond

the pleadings, that there is a genuine issue for trial." Miller,

454 F.3d at 987. This means that the nonmoving party "must do

more than simply show that there is some metaphysical doubt as to

the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith

Radio Corp., 475 U.S. 574, 586 (1986) (footnote omitted). The

nonmoving party may not rely on the mere allegations in the

pleadings and instead "must set forth specific facts showing that

there is a genuine issue for trial." Porter v. Cal. Dep't of

Corrs., 419 F.3d 885, 891 (9th Cir. 2005) (quoting Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)). "A genuine

dispute arises if the evidence is such that a reasonable jury

could return a verdict for the nonmoving party." California v.

Campbell, 319 F.3d 1161, 1166 (9th Cir. 2003); Addisu v. Fred
Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000) ("There must be
enough doubt for a 'reasonable trier of fact' to find for
plaintiffs in order to defeat the summary judgment motion.").

On a summary judgment motion, "the nonmoving party's
evidence is to be believed, and all justifiable inferences are to
be drawn in that party's favor."  Miller, 454 F.3d at 988
(quotations and brackets omitted).

IV.    ANALYSIS.

A.      Claim 1: Violation of Title VII of the Civil
        Rights Act of 1964.

1)      Prima Facie Sex Discrimination.

The first determination a court must make when a Title
VII claim is brought is whether the plaintiff establishes a prima
facie case of discrimination prohibited by Title VII.  See Hawn
v. Exec. Jet Mgmt. Inc., 615 F.3d 1151, 1155 (9th Cir. 2010);
Noyes v. Kelly Servs., 488 F.3d 1163, 1168 (9th Cir. 2007).

DAGS argues that Tanaka and Liashenko do not establish
a prima facie sex discrimination claim.  This court is not
persuaded.

To establish a prima facie case of disparate treatment
discrimination under Title VII, a plaintiff must show that (1)
she belongs to a protected class; (2) she was qualified for her
position; (3) she was subject to an adverse employment action;
and (4) similarly situated individuals outside her protected

class were treated more favorably.  See Davis v. Team Elec. Co.,
520 F.3d 1080, 1089 (9th Cir. 2008); see also Nicholson v.
Hyannis Air Serv., Inc., 580 F.3d 1116, 1123 (9th Cir. 2009).
The degree of proof required to establish a prima facie case for
Title VII on summary judgment is minimal.  Coghlan v. Am.
Seafoods Co., LLC, 413 F.3d 1090, 1094 (9th Cir. 2005).  DAGS
only disputes the third and fourth elements of the prima facie
case.  See Def. First Supp. Memo. in Support of Mot. Summ. J. at
3, ECF No. 57.

        For Title VII purposes, Tanaka and Liashenko both
belong to a protected class.  Tanaka is of Vietnamese national
origin, and Liashenko is a Caucasian male.  See McDonald v. Santa
Fe Trail Transp. Co., 427 U.S. 273, 280 (1976); Coghlan, 413 F.3d
at 1094.  Accordingly, they establish the first element of a
prima facie discrimination claim.

        Tanaka and Liashenko also demonstrate that they were
qualified for the CO III position given their experience with the
State's mainframe computer.  See Tanaka Decl. ¶ 53; Liashenko
Decl. ¶¶ 24-26.  Tanaka had worked with the computer systems at
ICSD for ten years and claims to have been "knowledgeable of the
workflow and processing cycles at all levels of ICSD's mainframe
computer environment."  See Tanaka Decl. ¶ 53(f).  Tanaka had
previously held a variety of computer positions at DAGS such as
Clerk IV, Data Processing Control Clerk, CO I, and CO II.

See id.  For ten months, Liashenko had worked with all the
equipment required for the CO III position.  See Liashenko Decl.
¶ 24; ECF No. 46, Ex. D.  According to his Declaration, Liashenko
"knew how to monitor, control and operate the IBM 2066-OX2 and
IBM 2066-OC1 Z800 series Mainframe computer systems."
See Liashenko Decl. ¶ 24.  DAGS Shift Supervisor Irene Ajitomi
states that Tanaka and Liashenko "had the skills to carry out the
responsibilities of the [ICSD] Data Center."  Declaration of
Irene Ajitomi ¶ 8 ("Ajitomi Decl."), ECF No. 46-2.

Tanaka and Liashenko also sufficiently demonstrate
adverse employment action, the third element of the prima facie
case.

Tanaka alleges that she suffered adverse employment
actions in the form of not being selected for the day shift CO
III position and in not being able to select the work shift of
her choice.  She says she was forced to work the midnight shift,
even though she is allegedly senior to Furumori.  See Opp'n at
28.[2]  Tanaka also alleges that working the midnight shift
adversely affected her health and her relationship with her
husband.  See Tanaka Decl. ¶¶ 108-118.  DAGS challenges the shift
assignment as not constituting an adverse employment action.

"[I]nconvenience resulting from a less favorable

---

[2] Togashi wrote to Liashenko that "seniority was not a
relevant factor in the selection process" of an open competitive
recruitment.  See ECF No. 46, Ex. H.

schedule can render an employment action 'adverse' even if the employee's responsibilities and wages are left unchanged." See Ginger v. District of Columbia, 527 F.3d 1340, 1344 (D.C. Cir. 2008). The Ginger court held that switching police officers from a permanent night shift to a rotating morning/afternoon/night shift was an adverse employment action because it "severely affected their sleep schedules and made it more difficult for them to work overtime and part-time day jobs." Id. A shift assignment that makes normal life difficult for an employee may constitute an adverse employment action. See Spees v. James Marine, Inc., 617 F.3d 380, 392 (6th Cir. 2010) (finding that assignment to night shift adversely affected plaintiff's ability to raise her daughter as a single mother); Freedman v. MCI Telecomms. Corp., 255 F.3d 840, 844 (D.C. Cir. 2001) (holding that a transfer to night shift was an adverse employment action because "the change in hours interfered with [the plaintiff's] education").

This court recognizes that Tanaka was likely aware that she might be assigned to a night shift. In the Pre-Interview Information, Tanaka was asked, "If selected, you will be assigned to a shift (day, swing, or midnight) in the Computer Operations Unit of the Production Services Branch whose need for a Computer Operator III is the most critical. Is this okay with you?" See ECF No. 57, Ex. U. Tanaka answered "Yes." See id. In addition,

15

the CO III position description stated in boldface, "For some positions applicants must be willing and able to work shifts, including evenings, weekends and holidays." See ECF No. 47, Ex. J. Tanaka's knowledge during the CO III interview that a night shift was possible does not necessarily mean that her night shift assignment was not an adverse action. DAGS presumably had to decide which shift to assign to each employee, and the court understands Tanaka to be alleging that she got the night shift because DAGS was discriminating against her. Viewing the facts in her favor, the court concludes that DAGS does not establish that Tanaka fails to show an adverse employment action. See Chuang v. Univ. of Cal. Davis, Bd. of Trs., 225 F.3d 1115, 1124 (9th Cir. 2000) ("Under the McDonnell Douglas framework, '[t]he requisite degree of proof necessary to establish a prima facie case for Title VII . . . on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence.'") (alteration in original) (quotation omitted).

Liashenko alleges adverse employment action in not being selected for the CO III position. A denial of a promotion qualifies as an adverse employment action under Title VII. See Breiner v. Nevada Dept. of Corrs., 610 F.3d 1202, 1208 (9th Cir. 2010).

With respect to the last element of the prima facie case, Tanaka and Liashenko argue that a similarly situated

16

individual outside their protected class (Furumori) was treated
more favorably.  Furumori was similarly situated to Tanaka and
Liashenko to the extent they all met the minimum qualifications
to be interviewed for the CO III positions.  Cf. Hawn v. Exec.
Jet Mgmt. Inc., 615 F.3d 1151, 1160 (9th Cir. 2010)
("[I]ndividuals are similarly situated when they have similar
jobs and display similar conduct.").  Furumori, a person of
Japanese national origin, is outside both Tanaka's and
Liashenko's protected classes.  Furumori was presumably treated
more favorably to the extent that she was offered a CO III
position as well as her choice of work shift.

     Construing the evidence in the light most favorable to
Plaintiffs, the court is persuaded that Tanaka and Liashenko have
produced enough evidence to set forth a prima facie case of
discrimination.

        2)        Legitimate, Nondiscriminatory
                      Reason.

     If a plaintiff establishes a prima facie case, the
burden of production shifts to the employer to articulate some
legitimate, nondiscriminatory reason for the challenged action.
Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1062 (9th
Cir. 2002) (quotations omitted).  "[T]he defendant must clearly
set forth, through the introduction of admissible evidence,
reasons for its actions which, if believed by the trier of fact,
would support a finding that unlawful discrimination was not the

cause of the employment action." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993) (quotations omitted). This is merely a burden of production, not proof, as the ultimate burden of persuasion resides with the employee. St. Mary's, 509 U.S. at 508; Villiarimo, 281 F.3d at 1062. The burden is also minimal, as the employer need only articulate, not prove, reasons for its actions. Bd. of Trs. of Keene State Coll. v. Sweeney, 439 U.S. 24, 25 & n.2 (1978). It need not prove a nondiscriminatory intent. Id. at 25 n.2, 99 S. Ct. 295. And courts "only require that an employer honestly believed its reason for its actions, even if its reason is foolish or trivial or even baseless." Villiarimo, 281 F.3d at 1063 (internal quotation marks omitted).

DAGS argues that the decision to choose Furumori as its first choice for the CO III position was merit-based. DAGS claims that Furumori had broader work experience than Tanaka or Liashenko. In the 1970s and 1980s, Furumori had worked for the State of Hawaii's Department of Budget and Finance. See Declaration of Wayne T. Sasaki ¶ 3 ("Sasaki Decl."), ECF No. 50-4. From 1990 to 2006, Furumori worked with the St. Francis Healthcare System, where she was responsible for scheduling, hiring, and training employees. See Second Declaration of Sandra P. Furumori ¶¶ 2-3, ECF No. 50-2. Furumori also oversaw the daily operations of the AS400 and RS6000 computer systems. See id. ¶ 3. During Liashenko's arbitration, Sumida testified

that Furumori's employment at St. Francis was similar to Sumida's position as Computer Operations Supervisor II at DAGS, which is two levels above a CO III.  See Grievance of Daniel Liashenko at 5, ECF No. 37, Ex. J.

DAGS notes that Arbitrator Kang found no evidence of discrimination against Liashenko or favoritism toward others by DAGS in the selection process.  See Arbitration, ECF No. 37, Ex. C.  The Arbitrator did not find any bias or inappropriate subjectivity.  See Arbitration at 11-12.  According to the Arbitrator, all the panel interviewers understood "their task was to select the most qualified person for the job, and that they must be fair in doing so."  See id. at 3.  The panel members were reportedly all able to articulate specific reasons for finding Furumori to be a stronger candidate over Liashenko.  See id. at 11.  The Arbitrator's view is not, of course, binding on this court, which must reach its own decision on the record before it, but the Arbitrator's analysis is consistent with the present discussion.

The court agrees with DAGS that the stated reasons are legitimate and nondiscriminatory.  Accordingly, DAGS satisfies its "minimal" burden of articulating a legitimate reason for its action.

### 3)      Pretext.

If an employer meets its burden of production, the

burden then shifts to the employee to prove that the employer's explanation was merely a pretext to conceal discriminatory conduct. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 804 (1973); Villiarimo, 281 F.3d at 1062. An employee's burden at this step is to prove pretext by a preponderance of the evidence. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000). On a summary judgment motion relating to pretext, an employee must "raise a genuine factual question whether, viewing the evidence in the light most favorable to [the employee], [the employer's] reasons are pretextual." Chuang v. Univ. of Cal. Davis, Bd. of Trs., 225 F.3d 1115, 1126 (9th Cir. 2000). An employee may meet this burden by directly showing that the employer was more likely motivated by discriminatory intent or by indirectly showing that the employer's explanation is unworthy of credence. Reeves, 530 U.S. at 143; Villiarimo, 281 F.3d at 1062. "Direct evidence typically consists of clearly sexist, racist, or similarly discriminatory statements or actions by the employer." Coghlan v. Am. Seafoods Co., 413 F.3d 1090, 1095 (9th Cir. 2005). A plaintiff may rely on circumstantial evidence or indirect evidence to show pretext, but such evidence must be both specific and substantial. Villiarimo, 281 F.3d at 1062.

(a)    Declarations of Irene Ajitomi<br>& Robert Palimoo.

Plaintiffs challenge DAGS's explanation that Furumori's selection was merit-based as not credible. Plaintiffs say that

the Declarations of Irene Ajitomi and Robert Palimoo establish that Furumori was not qualified for the CO III position. Ajitomi states that Furumori was not qualified for the CO III position because she lacked current technical skills useful in the ICSD Data Center and could not train computer operators on mainframe computers. See Ajitomi Decl. ¶ 8. Robert Palimoo, a Computer Operations Supervisor I who sat on other DAGS interview panels, echoes Ajitomi's assessments. See Declaration of Robert Palimoo ¶ 8 ("Palimoo Decl."), ECF No. 46-3. Palimoo states that, given Furumori's experience with only the AS400 systems, he would not have considered her a viable candidate for a CO III position. See Palimoo Decl. ¶ 30. He also adds that the State's mainframe computer systems and AS400 systems are "greatly different." See id. ¶ 29. Palimoo states that DAGS never looked at external applicants, such as Furumori, who did not have experience with mainframe systems. See id. ¶ 12. While these Declarations do not on their own suggest Title VII discrimination, Plaintiffs combine this evidence with evidence of DAGS's other allegedly discriminatory actions.

The court notes that Plaintiffs rely heavily on Furumori's lack of mainframe computer experience. Mainframe experience may not have been necessarily dispositive. Four relevant categories were examined by the interview panel: computer knowledge and experience, oral communication skills,

interpersonal ability, and problem solving/decision making. See ECF No. 48, Exs. Y, Z, AA. Specific experience with the State's mainframe computer system was not listed as a prerequisite. It is entirely possible that the panel deemed Furumori to have sufficient computer experience, even if with a less directly analogous computer system, and to have been more qualified than Tanaka and Liashenko in the three other categories. DAGS Systems Service Branch Chief Sasaki states that Furumori's prior work experience gave her "the necessary knowledge and fundamentals to 'pick up' the computer skills needed to be functional." Sasaki Decl. ¶ 3. He adds, "Ms. Furumori's background provided her the ability to more quickly pick up things up by applying her skills and knowledge of multiple operating system environments as well as her experience with different hardware to the State's systems." See id. ¶ 10. Thus, even if Furumori had less mainframe computer experience and skill than Tanaka and Liahsneko, she may have exceeded them in other categories. Nevertheless, the totality of the evidence does raise a question of fact as to whether DAGS's articulated reasons for hiring Furumori were pretextual. This is a question of fact for the jury, not for this court.

(b)      Possible Bias by Elton Sumida.

Plaintiffs present evidence of a possible bias on the part of Elton Sumida. Ajitomi states that, before the CO III

interviews, Sumida called her three times regarding Furumori.
See Ajitomi Decl. ¶ 6. On the first call, Sumida allegedly told
Ajitomi that Clifford Hirata's friend (Furumori) had been a
computer operator with the State of Hawaii over twenty years ago.
See id. ¶ 6(a). Hirata was a supervisor and the Production
Operations Support Section Manager in the ICSD of DAGS. See Def.
Mot. Summ. J. at 8, ECF No. 37. On the second call, Sumida
allegedly informed Ajitomi that he and Hirata both "backed"
Furumori and wanted her as a CO III. See Ajitomi Decl. ¶ 6(b).
On the third call, Sumida allegedly stated that he wanted
Furumori selected for lead operator. See id. ¶ 6(c).[3]

In his Declaration, Sumida denies that he tried to
influence Ajitomi regarding Furumori. See Declaration of Elton
Sumida ¶ 12, ECF No. 51-3. He claims that he instructed the
interview panel to be fair and objective and to take notes of the
interviewees' responses so that the panel could explain the
interview scores in any dispute. See id. ¶ 5. While the record
arguably shows only possible favoritism toward Furumori, not
Title VII discrimination, the court finds that there is a

_____

[3] The EEOC's determination that there was a basis to
consider Plaintiffs' discrimination complaint relied on Sumida's
alleged bias. See ECF No. 37, Ex. I ("there is reason to believe
that Sumida poisoned the application process in light of his
calls to Ajitomi about his desire to have Furumori placed in the
COIII position."). The EEOC does not point to evidence that the
alleged "poisoning" was based on race, sex, or national origin,
but the EEOC presumably concluded as much as the EEOC was well
aware of Title VII's scope.

question of fact as to whether Sumida's alleged bias related to race, sex, or national origin.

        (c)          Alleged Past Instances of <u>Discrimination.</u>

Finally, Plaintiffs point to five instances of DAGS's alleged preference for Japanese American applicants over more qualified non-Japanese applicants. In her Declaration, Tanaka states that the DAGS selection process was altered or slanted in favor of Japanese Americans. <u>See</u> Tanaka Decl. ¶¶ 20-30. Taken together and combined with questions about Furumori's qualifications and Sumida's alleged bias, these instances raise a question of fact as to whether there was a generalized preference for Japanese American applicants.

First, Plaintiffs allege that, in February 2003, Togashi and Sumida waited to open up the Computer Operation Scheduler position after the person who had had that job passed away. <u>See</u> Tanaka Decl. ¶ 20. They temporarily hired former Computer Operations Scheduler John Arita for 89 days. <u>Id.</u> Plaintiffs claim that this gave Togashi and Sumida an opportunity to train April Andrade, a Japanese American, for the Computer Operation Scheduler position, thus giving her an advantage over other applicants. <u>See</u> <u>id.</u>

Second, in December 2003, DAGS issued an Internal Vacancy Announcement for the Computer Operations Scheduler position. Tanaka knows of five people who applied: April

Andrade (Japanese), Kay Yoshida (Japanese), Robert Palimoo (Hawaiian Filipino), Jonel Braceros (Filipino), and Stephanie Visaya-Bose (Filipino).  See id.  It is not clear whether these five constituted the entire applicant pool.  According to Tanaka, Andrade was chosen for the position even though she was the only applicant without computer operation experience.  See id. Palimoo maintains that the Computer Scheduler position requires knowledge of the processes performed by Computer Operators. See Palimoo Decl. ¶ 23.  This is a point of contention, with Diane Matsuura claiming that the Computer Operations Scheduler position does not require computer operations experience. See Fourth Matsuura Decl. ¶ 4, ECF No. 59-1.

Third, Plaintiffs point to alleged instances of nepotism as demonstrating a preference for Japanese Americans. Blaine Matsuura, the son of DAGS Personnel Officer Dianne Matsuura, was hired to work in the DAGS computer room for a summer.  See Tanaka Decl. ¶ 23.  Blaine Matsuura's position was later given to Brent Saito, the son of DAGS Comptroller Russell Saito.  See Tanaka Decl. ¶ 28.  Tanaka knows of two Hawaiian applicants who were rejected in favor of Brent Saito.  See id. ¶ 24.  It is not clear that racism, rather than nepotism, was the operative preference here, but racism and nepotism may sometimes be not easily separable.

Fourth, in October 2005, DAGS issued an internal

25

vacancy announcement for two CO II positions.  There were four applicants for the position:  Jonel Braceros (Filipino), Benjamin Quimino (Filipino), Ted Koseki (Japanese), and Daniel Pangilinan (Filipino).  See ECF No. 47, Ex. H; Tanaka Decl. ¶ 29.  The panel selected Quimino and Koseki even though, Tanaka alleges, Braceros had the most seniority with the State of all the applicants.  See Tanaka Decl. ¶ 29.  Koseki had less than a year of service with the State and declined the position.  See id.  Tanaka complains that the position was not offered to Braceros or Panigilinan and argues that this demonstrates a discriminatory selection process. See id. ¶¶ 29-30.

Fifth, a preferential hiring allegedly occurred in September 2008 when an Internal Vacancy Announcement was issued for Sumida's Supervisor II position.  See Tanaka Decl. ¶ 81.  The three applicants for the position were Clifford Lucas (Filipino), Steven Nieto (Filipino), and Sandra Furumori (Japanese).  See id. ¶ 82.  At the time, Furumori had under two years of experience as a CO III.  See id.  According to Tanaka, Clifford Lucas and Steven Nieto had both been working at DAGS longer than Furumori and were Computer Operations Supervisors I.  See id.  Furumori was ultimately selected for the position.  Although the interview panel consisted of people from other State Departments, Tanaka says this was part of an effort to display a false aura of fairness.  See id. ¶ 83.  She adds that Lucas and Nieto had more

work experience in ICSD and more technical and operational supervisory knowledge than Furumori.  See id. ¶ 88.  While there is evidence demonstrating that Furumori was also qualified, there is a question as to who was the most qualified candidate, and as to whether race discrimination played a role in this interview process.  See ECF No. 46, Ex. P (Furumori's resume); Sasaki Decl. ¶ 6 (Furumori's experience included "working operational issues to meet schedules, work[ing] with vendors on support issues, work[ing] manpower and staffing issues, and [having] been involved with facility management.").

Although Plaintiffs have far from the strongest evidence of pretext, they raise a genuine issue of fact as to whether DAGS's proffered reasons for its actions were a pretext for Title VII discrimination.  In other words, while a reasonable jury might find that DAGS was justified in its decisions, a reasonable jury, relying on the combination of the submitted Declarations, actions by DAGS employees indirectly involved in the interview process, and past instances of DAGS's alleged preference for Japanese applicants over more qualified non-Japanese applicants, that DAGS's proffered reasons were a pretext for Title VII discrimination.  The Title VII claims therefore survive the present motions.

B.      Claim 2 (Retaliation).

To make out a prima facie case of retaliation under

Title VII, a plaintiff must show that (1) he engaged in a protected activity; (2) he suffered an adverse employment action; and (3) there was a causal link between his activity and the adverse employment action. Freitag v. Ayers, 468 F.3d 528, 541 (9th Cir. 2006).

### 1) Protected Activity.

With respect to the first element, Tanaka and Liashenko engaged in protected activity when filing complaints alleging discrimination with the HCRC and EEOC. Complaints to the EEOC qualify as a protected activity. See Nilsson v. City of Mesa, 503 F.3d 947, 954 (9th Cir. 2007); McGinest v. GTE Service Corp., 360 F.3d 1103, 1125 n.19 (9th Cir. 2004).

### 2) Adverse Employment Action.

Tanaka and Liashenko argue that they suffered an adverse employment action when their positions were eliminated due to a reduction-in-force ("RIF") policy, and they were forced to apply for alternate state jobs. See Opp'n at 28; Tanaka Decl. ¶ 102. But they cannot rely on the RIF as their adverse employment action. As the RIF was never mentioned in the Complaint, DAGS was not on notice that this case concerned the RIF.

Even if the RIF could be considered, it does not qualify as an adverse employment action. The RIF was carried out pursuant to the State of Hawaii's DHRD Policy and the applicable

collective bargaining agreement for Bargaining Unit 03.
See Reply at 14, ECF No. 51.  The RIF was a state-wide procedure
resulting from a lack of funding.  See Fourth Matsuura Decl.
¶¶ 9, 11.  There is no indication that Tanaka and Liashenko were
the only ones affected by RIF, or that there was a violation of
RIF procedures.  No evidence suggests that race, sex, or national
origin played a part in RIF decisions.  For example, no evidence
indicates that employees of Japanese ancestry were less affected
by the RIF.  Moreover, Tanaka and Liashenko both received jobs
with the State when they reapplied.  Tanaka received the same CO
III position, and Liashenko received a job with the same pay.
See id. ¶¶ 9, 10.

Nor do Tanaka and Liashenko identify an adverse
employment action in the form of any other matter set forth in
their retaliation claims.  See Compl. ¶ 16.

First, Liashenko alleges that he was investigated for a
complaint that he may have misused sick leave.  See Liashenko
Decl. ¶ 47.  On May 14, 2008, Liashenko had left work early
claiming he was sick, but was seen attending an EEOC seminar at
the Hawaii Convention Center.  See id. ¶ 48.  The matter was
investigated, and Liashenko was found to have done nothing wrong.
See ECF No. 37, Ex. M.

Second, Liashenko alleges retaliation because a fellow
employee, Jonel Braceros, complained that Liashenko had not

29

performed his work properly.  See Liashenko Decl. ¶ 52.
Liashenko does not explain how DAGS is responsible for Braceros's
actions.  Furthermore, the Supreme Court has stated that "[a]n
employee's decision to report discriminatory behavior cannot
immunize that employee from those petty slights or minor
annoyances that often take place at work and that all employees
experience."  Burlington N. & Santa Fe Rv. Co. v. White, 548 U.S.
53, 68 (2006).  "[P]ersonality conflicts at work that generate
antipathy and snubbing by supervisors and co-workers are not
actionable."  Id.

        Third, Liashenko alleges that he was the basis for a
memorandum requiring employees to stay in the computer room until
the end of their shifts.  See ECF No. 46, Ex. JJ.  DAGS argues
that this memo was issued because of possible employee safety
concerns resulting from allegations of a workplace disagreement
between Liashenko and Braceros.  See Def. Mot. Summ. J. at 24.
The workplace incident involved Liashenko's alleged failure to
give turnover information to Braceros when Braceros was allegedly
late.  See Opp'n at 10-11.

        Lastly, Tanaka and Liashenko allege that Furumori
retaliated against them after seeing them in the break room by
prohibiting the use of the break room as a waiting area.  On
November 12, 2008, Furumori had issued a memorandum that allowed
computer operators to wait in the break room and computer room

areas for the end of a shift.  See ECF No. 37. Ex. O.  On
December 12, 2008, Furumori issued a memorandum stating that
staff could no longer use the break room at the end of a shift.
See ECF No. 39. Ex. N.  Tanaka and Liashenko allege that, between
November 12, 2008, and December 8, 2008, Furumori knew that only
Tanaka and Liashenko used the break room.  See Liashenko Decl.
¶ 56.  They also allege that Furumori observed them in the break
room on or about December 8, 2008.  See id.  DAGS maintains that
the December 2008 memorandum banning the use of the break room
was directed to all employees, not just Tanaka and Liashenko.
See ECF No. 39, Ex. N.  DAGS also notes that the December 2008
memorandum permitted employees to use other areas such as the
computer room.  See id.

      Overall, these actions do not qualify as adverse
employment actions because they are not materially adverse.
"[A]n action is cognizable as an adverse employment action if it
is reasonably likely to deter employees from engaging in
protected activity."  See Elvig v. Calvin Presbyterian Church,
375 F.3d 951, 965 (9th Cir. 2004) (citations omitted).  An
employee suffers from an adverse employment action if he or she
experiences materially adverse consequences affecting the terms
and conditions of employment.  See Burlington N. & Santa Fe Rv.
Co. v. White, 548 U.S. at 53.  A tangible employment action
occurs when there is "a significant change in employment status,

such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  See <u>Burlington Industries, Inc. v. Ellerth</u>, 524 U.S. 742, 761 (1998).

Among the employment decisions that the Ninth Circuit recognizes as "adverse employment action" are termination, dissemination of a negative employment reference, issuance of an undeserved negative performance review, and refusal to consider for promotion.  <u>Brooks v. City of San Mateo</u>, 229 F.3d 917, 928 (9th Cir. 2000).  Tanaka and Liashenko cite incidents that neither fit into these recognized categories nor rise to the same level of materially adverse action.  Accordingly, they fail to demonstrate adverse employment action.

3)        Causation.

Even if the court were to find an adverse employment action, Tanaka and Liashenko fail to demonstrate a causal link between the allegedly adverse employment actions and their complaints to the EEOC and HCRC.  To show a causal link between activity protected under Title VII and retaliation by an employer, a plaintiff must present evidence sufficient to raise an inference that the protected activity was the likely reason for adverse action and that the employer was aware that plaintiff had engaged in protected activity.  <u>Stegall v. Citadel Broad. Co.</u>, 350 F.3d 1061, 1065 (9th Cir. 2003).  Plaintiffs do not

present evidence that the allegedly adverse employment action flowed from their discrimination complaints.

Because Plaintiffs do not make out a prima facie case of retaliation, the court grants DAGS's motions for summary judgment with respect to this claim.

C.       Spoliation of Evidence.

Plaintiffs argue that certain missing documents may be relevant to whether DAGS's legitimate and nondiscriminatory reasons for its actions are actually pretextual.  See Opp'n at 37.  Plaintiffs ask for an adverse inference against DAGS because DAGS allegedly did not preserve certain employment records.

Plaintiffs' motion for spoliation of evidence is too broad.  Under the State of Hawaii General Records Schedule 5.10, the State has a two-year record retention period.  See Opp'n at 38; Reply at 10, ECF No. 51; State of Hawaii General Records Schedules, available at: http://hawaii.gov/dags/archives/records-management/GRS%202002%20-%20revised%205-06.pdf.  Tanaka and Liashenko interviewed for the CO III position in September 2006.  Liashenko filed his EEOC/HCRC complaint in December 2006, and Tanaka filed her EEOC/HCRC complaint in January 2007. See Opp'n at 38.  Therefore, Plaintiffs had a right to expect that DAGS still had relevant personnel or employment records going back to September 2004, at the earliest.  Plaintiffs, however, request documents going back to 2001.  See id. at 37.

In general, a party has a duty to preserve evidence
when it knows or reasonably should know the evidence is
potentially relevant to litigation and when the destruction of
that evidence prejudices the opposing party.  See United States
v. Kitsap Physicians Serv., 314 F.3d 995, 1001 (9th Cir. 2002) (A
party "engage[s] in spoliation of [evidence] as a matter of law
only if they had some notice that the [evidence was] potentially
relevant to . . . litigation before [it was] destroyed."); Ingham
v. United States, 167 F.3d 1240, 1246 (9th Cir. 1999) ("To be
actionable, the spoliation of evidence must damage the right of a
party to bring an action.") (citing Unigard Sec. Ins. Co. v.
Lakewood Eng'g & Mfg. Co., 982 F.2d 363, 371 (9th Cir. 1992)).
In this case, DAGS was not put on notice that information going
back to 2001 (and not directly related to Tanaka or Liashenko)
would be requested.  See Second Declaration of Diane Matsuura
¶¶ 11-15, ECF No. 50-1.  All relevant DAGS records relating to
the CO III selection process for Tanaka, Liashenko, and Furumori
were preserved.  Accordingly, the court denies Plaintiffs'
request for an adverse inference based on the alleged spoliation
of evidence.

V.        CONCLUSION.

For the foregoing reasons, the court grants in part and
denies in part DAGS's motion for summary judgment.  Plaintiffs'
Title VII claims proceed for further adjudication, while summary

judgment on their retaliation claims is entered against them, and their request for an adverse inference based on spoliation is denied.  Tanaka and Liashenko's discrimination claim under Hawaii Revised Statutes § 378-2(1) was not the subject of this motion.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii April 27, 2011.



/s/ Susan Oki Mollway
Susan Oki Mollway
Chief United States District Judge


Tanaka et al. v. Department of Accounting and General Services, State of Hawaii, Civil No. 09-00579 SOM/KSC; ORDER GRANTING IN PART, DENYING IN PART DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT.